✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

Jun 22, 2022

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___MD___ Deputy

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**IN THE MATTER OF THE SEARCH OF**

| | |
|---|---|
| One Dark Gray in Color Samsung, Model SM-G977N Cellular Telephone, IMEI Number 355741/10/580335/7 SKT | Case No. __22-mj-783-CBD__ |
| One Silver in Color Apple iPhone with Yellowish Case, Model A1634, FCC ID BCG-E2944A, IC: 579C-E2944A | Case No. __22-mj-784-CBD__ |
| One Dark Blue in Color, Redmi, Model M1906G7G Cellular Telephone, with Cracks on Screen and Back of Phone | Case No. __22-mj-785-CBD__ |
| Currently in ATF custody in Hyattsville, MD | |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR WARRANTS TO SEARCH AND SEIZE

I, John P. Cooney, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), U.S. Department of Justice, being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am employed with the ATF, U.S. Department of Justice, Baltimore Field Division, Hyattsville I Field Office, as a Special Agent ("SA") and have been so employed since August 2002. I have successfully completed the Criminal Investigator Training Program and ATF New Professional Training Academy at the Federal Law Enforcement Training Center located in Glynco, Georgia. I received specialized training in the investigation of state and federal crimes involving the use of alcohol, tobacco, firearms, explosives, and arson.

2.      Prior to joining the ATF, I was employed as a police officer with the City of Alexandria, Virginia, Police Department since July 2001. I graduated from the Basic Law Enforcement School at the Northern Virginia Criminal Justice Training Academy, located in

Sterling, Virginia, where I received specialized training in firearms offenses, narcotics offenses, and conducting basic police investigations.

3.      Since 2001, I have been involved in numerous firearms and narcotics investigations such as investigations into illegal firearms trafficking; possession of firearms by prohibited persons; use of a firearm in furtherance of any crime of violence or drug trafficking crime; possession with intent to distribute and distribution of controlled substances; engaging in financial transactions to promote, disguise or conceal illegal drug or firearms trafficking and the source of the proceeds derived from it; and engaging in monetary transactions involving the proceeds of specified unlawful activity; and conspiracies associated with the foregoing criminal offenses.  In conducting and participating in investigations of the above-mentioned criminal acts, I have been involved in the utilization of investigative techniques such as preparing and executing search warrants which have led to seizures of narcotics, firearms, and proceeds and assets of illicit activities; conducting mobile and static surveillance; and interviewing and debriefing confidential informants and witnesses.

4.      As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

5.      I know that firearms and narcotics traffickers routinely utilize cellular telephones, personal data devices, computers, external hard drives, thumb drives, CDs/DVDs, and other electronic media to facilitate their firearm or narcotic distribution operations.  Further, firearms and narcotics trafficking are an ongoing process that requires the development and use of a secure communication network to facilitate daily contact with potential purchasers of firearms or narcotics. Firearms and narcotics traffickers use the above-described electronic devices to maintain contact

with their customers and/or accomplices as well as to keep a record utilizing ledgers and other created documents to keep track of their activities.

6.      As part of my work, I have conferred with experienced agents and supervisors and also attended trainings.  As a result of this training and experience, I am familiar with the appearance, prices, and terminologies involving the possession, use, and manufacturing of firearms, including but not limited to machineguns, silencers, short-barreled rifles, short-barreled shotguns, and destructive devices, that are subject to regulation under the provisions of the National Firearms Act (NFA) (codified at Title 26 of the United States Code) and/or the Gun Control Act (codified at Title 18 of the United States Code).

7.      Through my participation in firearms and firearms trafficking investigations as well as my training, experience, and conversations with other law enforcement personnel, I am familiar with the methods and practices of firearms traffickers, including the methods used by them to manufacture, smuggle, safeguard, and distribute firearms, and to collect and launder trafficking-derived proceeds.  I am further aware of the methods employed by firearms traffickers to thwart the investigation of their illegal activities.  Based on my experience and training and through consultation with experienced special agents, police officers, and firearms experts, I know the following with respect to unlawful firearm possessors and firearms traffickers:

a.      They often possess and traffic firearms, firearm components, ammunition, ammunition magazines, holsters, slings, firearm cleaning equipment, instruction material, targets (used and new), receipts for the purchase and/or repair of these items, and spare gun parts such as springs, barrels, trigger assemblies, stocks, grips, and receivers in their homes.  They may also possess incomplete receivers, commonly referred to as "ghost guns," "eighty percent receivers," or

"eighty-percenters," that can be made into completed receivers and/or firearms. These items may be stored in overt and/or covert storage areas such as safes, storage units, vaults, and hidden compartments.

        b.      They often take photographs and videos of themselves while armed and/or while posing with firearms. Such "trophy shots" are often kept as mementos or novelties on electronic storage devices. Photographs and videos are also used to advertise firearms for sale to potential buyers. Due to the advancement in technology, firearms traffickers may use physical and virtual servers through the Internet, including a cloud, to store such photographs and videos.

        c.      They often have indicia or documents related to their firearms trafficking. These include ledgers, receipts for firearms parts and accessories, and other documents related to firearms. Since firearms, firearm parts, and firearm accessories are likely to be shipped in boxes, containers, or parcels, to which shipping labels, bills of lading, confirmation numbers and/or tracking numbers may be affixed, firearm possessors and firearms traffickers typically use computers and other electronic storage media, including smart phones, and physical and virtual servers through the Internet, including a cloud, to store such records and track such packages.

        d.      The trafficking and possession activities described above are often arranged through the use of communication devices such as cellular telephones/computers. I know that people who negotiate the illegal sale of firearms in the manner described above will often use cellular telephones/computers to contact their sources of supply to obtain additional quantities of firearms or firearms components. Similarly, traffickers will use cellular telephones/computers to contact their customers to facilitate firearms transactions, specifically to discuss quantity and price, shipment methods, and/or arrange meeting locations.

e.    In order to contact their customers and their sources of supply, individuals who engage in firearms trafficking maintain addresses, telephone numbers and books, or papers that reflect names, addresses, and/or telephone numbers for their associates in their illegal organization as well as their customers.  Due to the advancement in technology, drug traffickers may use computers and other electronic storage media, including smart phones, and physical and virtual servers through the Internet, including a cloud, to store such records.

8.    I am aware from prior experience, and from consulting with ATF Digital Investigators, that many cellular telephones have an address/phone book feature, which allows the device to store names and telephone numbers in the device's memory.  I am also aware that many cellular telephones incorporate a Caller ID feature to capture and store the telephone number of incoming calls or text messages.  I have also learned that cellular telephones may be connected to computers and other peripheral devices, such as external hard drives, CDs and DVDs that also may contain copies of e-mails, ledgers, documents, and histories of websites visited by the user and may also contain copies of said phone book features by as well as calls and text messages sent and received, photos and movies.

9.    I am also aware from prior experience that the analysis of the names and telephone numbers contained in cellular telephones, computers, external hard drives, CDs and DVDs, other electronic peripherals as well as sent, received, and draft text messages, websites visited, photos, movies and sent, received, and draft e-mails, social networking websites, documents such as ledgers and other written information is very useful to law enforcement and provides valuable evidence concerning the scope of firearms and narcotics trafficking organizations, methods of operation, and money laundering efforts. In addition to the ability to store names and numbers, many cellular

5

telephones, computers, external hard drives, CDs, and DVDs as well as other electronic peripherals have the technical capability to store e-mail, sent and received telephone calls, text, photos, movies, IP addresses, internet browser history, ledgers, documents, social networking websites and GPS features and voice recordings which also have proven valuable to law enforcement.

10.     During the course of this investigation, I have consulted with computer forensic persons at ATF. Based on their experience, I now know that searching and seizing information from computers, cellular telephones, PDAs, external hard drives, CDs, and DVDs often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

        a.      The volume of evidence. Computer storage devices (like hard drives, CDs, DVDs) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files is evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

        b.      Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific

procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

       c.     Based upon my knowledge, training and experience, and based upon the advice of these computer forensic people,  I know that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.  This is true because of the following:

       i.     The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.  Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

       ii.     If, after inspecting the I/O devices, software, documentation, and data security devices, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them within a reasonable time.

**PROBABLE CAUSE**

11.     As a result of the investigation described below, there is probable cause to believe that the items listed below contain evidence of criminal offenses, to wit:  possession with intent to distribute controlled dangerous substances, in violation of Title 21 U.S.C. § 841(a)(1); possession of a firearm by a prohibited person, in violation of Title 18 U.S.C. § 922(g)(1); use and carry a firearm during and in relation to, and possess a firearm in furtherance of, a drug trafficking crime, in violation of Title 18 U.S.C. § 924(c); and dealing in firearms without a license, in violation of Title 18 U.S.C. § 922(a)(1)(A).  Since this affidavit is being submitted for the limited purpose of searching the target property, it does not include each and every fact known to me or to the government.  I have set forth only those facts necessary to support probable cause.

12.     This Affidavit is being submitted in support of applications for search and seizure warrants for the following property seized from Dwight Luis CLARKE, and currently in the custody of the ATF Hyattsville I Field Office, secured in the office evidence vault:

- One dark gray in color Samsung, Model SM-G977N cellular telephone, IMEI Number 355741/10/580335/7 SKT ("**TARGET DEVICE 1**");

- One silver in color Apple iPhone with yellowish case, Model A1634, FCC ID BCG-E2944A, IC: 579C-E2944A ("**TARGET DEVICE 2**");

- One dark blue in color, Redmi, Model M1906G7G cellular telephone, with cracks on screen and back of phone ("**TARGET DEVICE 3**").

The aforementioned property shall hereinafter be referred to as "the **TARGET DEVICES**."

13.     The **TARGET DEVICES** relate to an investigation of Dwight Luis CLARKE, which is being conducted by Special Agents with the ATF Hyattsville I Field Office, the Montgomery County Police Department (MCPD) and the Rockville City Police Department (RCPD).  Based on this investigation, I have determined that CLARKE is a trafficker of narcotics and firearms in

8

Montgomery County, Maryland.

14.     Because the **TARGET DEVICES** are already in ATF custody, good cause exists to permit the execution of the requested warrants at any time in the day or night.

## FACTS

15.     During early 2022, ATF Special Agents, Detectives with the Montgomery County Police Department (MCPD) and the Rockville City Police Department (RCPD), received information that an individual, identified as CLARKE, was engaged in the distribution of narcotics as well as firearms in Maryland.

16.     I examined CLARKE**'s** criminal history, which revealed the following criminal conviction, among others:

a.      09-19-2019:  Guilty of Regulated Firearm:  Illegal Possession in the Circuit Court for Montgomery County, MD, case number 128173C.  CLARKE was subsequently found to have violated his probation term in this matter and was sentenced to 5 years in prison.

17.     I contacted a representative of the Maryland Parole Commission, who confirmed that CLARKE has not been pardoned, nor has he received relief for any conviction and therefore is prohibited from possessing firearms and ammunition.  The conviction noted above carries a maximum term of imprisonment exceeding two years.

18.     Additionally, I queried CLARKE**'s** employment history with the State of Maryland and learned that he is currently receiving unemployment benefits and reports a home address as being 20519 Staffordshire Drive, Germantown, MD**.**

## PURCHASE OF CRACK COCAINE AND TWO FIREARMS ON FEBRUARY 10, 2022

19.     During the beginning of February 2022, an ATF Special Agent (SA), acting in an

Undercover (UC) capacity, hereinafter referred to as UC 6064, telephonically contacted CLARKE on a phone number developed during the course of the investigation that I know is used by CLARKE. During the course of their communication, CLARKE agreed to sell UC 6064 $200.00 of crack cocaine and two firearms—one purported privately made firearm ("PMF") that CLARKE referred to as a "ghost gun," for $800.00, and an AR-15 style pistol for $500.00. The pair agreed to meet at a known location in Montgomery County, MD on the afternoon of February 10, 2022.

20.    UC 6064 was operating an ATF vehicle outfitted with audio and video recording equipment and was also wearing an item of clothing with audio/video capabilities as well, in order to capture audio and video of the transaction and conversation with CLARKE. Prior to departing a pre-designated meeting location, UC 6064 and I searched the interior of the UC vehicle for the presence of any U.S. currency and contraband, with negative results.

21.    Prior to the initiation of the operation, MCPD Detectives initiated surveillance at the CLARKE's residence and observed CLARKE, operating a vehicle registered to him pull up to and park in a parking space in the vicinity of his residence. MCPD Detectives watched as CLARKE entered his residence and, shortly thereafter, observed CLARKE exit same, carrying what appeared to be a dark colored coat, which appeared to contain an item suspected to be at least one firearm. CLARKE deposited the coat in the passenger compartment of his vehicle, entered the driver's seat and departed the area.

22.    A short time later, Detectives conducting surveillance of the meeting location observed CLARKE's vehicle enter the location and park next to UC 6064's vehicle. Law enforcement observed CLARKE exit his vehicle and deposit items wrapped in what appeared to be a dark colored jacket in the rear passenger compartment of UC 6064's vehicle. CLARKE and UC

10

6064 began to converse and law enforcement observed CLARKE hand UC 6064 an object and UC 6064 provide an object back to CLARKE before CLARKE departed the area in his vehicle.

23.     I followed UC 6064 back to the pre-designated meeting location and recovered the following items of evidence from the rear passenger compartment of the UC vehicle:

- One Polymer80, Inc, Model PF940C, 9mm caliber, semi-automatic pistol, bearing no apparent serial number, a PMF.

- One Smith & Wesson, Model M&P 15-22. .22 caliber, semi-automatic AR style pistol, bearing serial number WAL9422.

- One 33 round, 9mm caliber extended magazine, which contained one Tulammo, 9mm caliber cartridge.

- One .22 caliber extended AR style magazine, which was loaded with three CCI, .22 caliber cartridges.

- One CCI, .22LR caliber mini mag ammunition box, containing a total of ninety-five CCI, .22LR caliber cartridges.

- Approximately 3.8 grams gross weight of suspected crack cocaine wrapped in a gray plastic twist-off baggie.

The UC vehicle was again searched for the presence of any additional contraband or U.S. currency with negative results.

24.     The purchased suspected crack cocaine was submitted to the MCPD Crime Laboratory for testing, which revealed that the evidence contained a net weight of 3.5 grams of cocaine, a Schedule II controlled substance.

**PURCHASE OF CRACK COCAINE AND ONE FIREARM ON FEBRUARY 17, 2022**

25.     During the middle of February 2022, UC 6064 communicated via voice and text with CLARKE via cellular telephone number (240) 751-8902 regarding purchasing narcotics and firearms from CLARKE. During the course of their communication, CLARKE agreed to sell UC 6064 one-

11

half of an ounce of crack cocaine for $500.00 and one pistol for $400.00. The pair further discussed the price of the crack cocaine because CLARKE stated that he would be losing money at selling the drugs at the quoted price and finally agreed to sell the crack cocaine to UC 6064 for $700.00. The pair agreed to meet at a known location in Montgomery County, MD on the afternoon of February 17, 2022.

26.     On the afternoon of February 17, 2022, CLARKE contacted UC 6064 and advised that his friend had the firearm, that his friend was currently at work, and that CLARKE would not be able to obtain the firearm until approximately 6:00 to 7:00 p.m. that night. UC 6064 told CLARKE that it would purchase the one-half ounce of crack cocaine and that CLARKE could hold the firearm until they met the next time.

27.     UC 6064 was operating an ATF vehicle outfitted with audio and video recording equipment and was also wearing an item of clothing with audio/video capabilities as well, in order to capture audio and video of the transaction and conversation with CLARKE. Prior to departing a pre-designated meeting location, UC 6064 and I searched the interior of the UC vehicle for the presence of any U.S. currency and contraband, with negative results.

28.     Prior to the initiation of the operation, MCPD Detectives initiated surveillance of CLARKE's residence and observed CLARKE vehicle parked in close proximity to his residence. Detectives later observed CLARKE exit his residence, enter his vehicle, and depart the area. A short time later, Detectives conducting surveillance of the meeting location observed CLARKE's vehicle pull up next to the UC vehicle and CLARKE and UC 6064 converse through their open driver's side windows.

29.     Law enforcement observed CLARKE open the trunk of his vehicle and retrieve an

unknown item and enter the front passenger seat of UC 6064's vehicle. I overheard CLARKE and UC 6064 discuss PMFs, including CLARKE tell UC 6064 that he could not go into a gun store for the same reasons that UC 6064 said it could not go to a gun store, that is, due to their own prior felony convictions. I also heard CLARKE detail to UC 6064 how he and others sell PMFs for a profit.

30.    Shortly thereafter, CLARKE exited UC 6064's vehicle and leaned in the driver's side of his vehicle, at which time he told UC 6064 that he would be right back, then entered his vehicle and drove around the shopping center toward a side entrance of the shopping center. UC 6064 relayed over a body wire that CLARKE was going to retrieve the aforementioned firearm from his friend and sell it to UC 6064.

31.    Detectives observed an unknown black male walking from a nearby 7-Eleven behind the shopping center and enter the front passenger seat of CLARKE**'s** vehicle and watched as CLARKE returned to the area of UC 6064's vehicle but parked approximately 100 yards from the UC vehicle.

32.    I observed CLARKE exit the driver's seat of his vehicle and walk with his hands in the pocket of his hooded sweatshirt toward UC 6064's vehicle and enter the front passenger seat. CLARKE and UC 6064 had a brief conversation and CLARKE exited the UC vehicle and walked back toward his vehicle before departing the area.

33.    I followed UC 6064 to a pre-designated meeting location and recovered the following items of evidence from the passenger compartment of the UC vehicle: (1) One clear plastic bag containing an approximate gross weight of 15.02 grams of suspected crack cocaine (this item was later field tested, which revealed a positive result); and (2) one tan leather apparent bottle pouch

which contained one Walther, Model PPK, .380 caliber, semi-automatic pistol, bearing serial number 899337 with no magazine.  The UC vehicle was again searched for the presence of any U.S. currency and contraband with negative results.

34.     The purchased crack cocaine was submitted to the MCPD Crime Laboratory and is currently pending examination.

35.     I debriefed UC 6064, who advised, in part, that during its meeting with CLARKE, CLARKE told UC 6064 that he is going to weigh the crack cocaine out and watched as CLARKE retrieved a clear plastic bag containing a large amount of a white, rock like substance, (suspected to be crack cocaine) and placed it on a scale.  CLARKE then exited his vehicle, stating that he needed to retrieve a plastic bag from his trunk, which he did, then placed the suspected crack cocaine from the scale into the plastic and entered the front passenger side of the UC vehicle with the UC to continue the conversation and ultimately the purchase of the crack cocaine and the firearm.

### PURCHASE OF CRACK COCAINE, SUSPECTED HEROIN/FENTANYL AND A FULLY ASSEMBLED 9MM CALIBER PMF ON FEBRUARY 23, 2022

36.     During the middle of February 2022, UC 6064 communicated via voice and text with CLARKE via cellular telephone number (240) 751-8902 regarding the purchase of narcotics and firearms from CLARKE.  During the course of their communication, CLARKE agreed to sell UC 6064 a fully assembled Glock 26 "Ghost Gun" (slang term for a PMF) for $1100.00 and one ounce of crack cocaine for $1,400.00.  During the course of several controlled calls between UC 6064 and CLARKE, CLARKE made it clear that if the UC wished to purchase the PMF fully assembled, there would be an up-charge associated with the order.  UC 6064 and CLARKE eventually agreed to meet on the afternoon of February 23, 2022, in a known location in Montgomery County, MD.

37.     UC 6064 was operating an ATF vehicle outfitted with audio and video recording

14

equipment to capture audio and video of the transaction and conversation with CLARKE. Prior to departing a pre-designated meeting location, UC 6064 and I searched the interior of the UC vehicle for the presence of any U.S. currency and contraband, with negative results.

38.     Prior to the initiation of the operation, MCPD Detectives conducted surveillance at CLARKE's residence and observed CLARKE's vehicle pull into the area. CLARKE was observed exiting the driver's seat and entering his residence and, a short time later, Detectives observed CLARKE exit his residence while stuffing unknown objects into the pockets of his pants, causing them to bulge. CLARKE entered the driver's seat of his vehicle, which then departed the area.

39.     A short time later, I observed CLARKE's vehicle park in a space approximately 200 yards from UC 6064's vehicle and watched as CLARKE exited the driver's seat of his vehicle and walk toward UC 6064's vehicle and enter the front passenger seat.

40.     I heard, over the body wire, that a transaction for a firearm and narcotics had been conducted. During the course of subsequent conversation, I heard CLARKE bragging to UC 6064 that he had heroin mixed with fentanyl and UC 6064 asked if CLARKE had it with him. CLARKE confirmed that he had some in his vehicle and UC 6064 asked CLARKE for $200.00 worth. I observed CLARKE exit the UC vehicle and walk back toward and enter the driver's side of his vehicle.

41.     A short time later, I observed CLARKE exit the driver's seat of his vehicle and walk to and enter the front passenger seat of UC 6064's vehicle. I then heard, over the body wire, an apparent drug transaction between CLARKE and UC 6064. During the course of their conversation, I heard CLARKE tell UC 6064 that the heroin was laced with fentanyl.

42.     I followed UC 6064 back to a pre-designated meeting location and recovered the

following items of evidence from the passenger compartment of the UC vehicle: (1) one Polymer80 Inc., model PF940SC, 9mm caliber, semi-automatic pistol, bearing no apparent serial number, a PMF; and (2) one dark colored latex/plastic glove, containing a white bag containing approximately one ounce of suspected crack cocaine, and one white in color tied plastic bag containing several gel caps, which contained a white/pink in color powder substance suspected to be heroin/fentanyl. The UC vehicle was again searched for the presence of any additional contraband or U.S. currency with negative results.

43.     The purchased suspected crack cocaine and suspected heroin/fentanyl were submitted to the MCPD Crime Laboratory for testing, which reported that the evidence contained a net weight of 27.52 grams of cocaine, a Schedule II controlled substance and 3.24 grams of fentanyl, a Schedule II controlled substance.

## PURCHASE OF THREE PMF PISTOLS ON FEBRUARY 28, 2022

44.     During the end of February 2022, UC 6064 communicated via voice and text with CLARKE, via cellular telephone number (240) 751-8902, regarding the purchase of narcotics and firearms from CLARKE. During the course of their communication, CLARKE agreed to sell UC 6064 three fully assembled Glock-type "Ghost Guns" for a total of $3000.00. During their conversation, UC 6064 and CLARKE agreed to meet on the afternoon of February 28, 2022, at a known location in Montgomery County, MD.

45.     UC 6064 was operating an ATF vehicle outfitted with audio and video recording equipment to capture audio and video of the transaction and conversation with CLARKE. Prior to departing a pre-designated meeting location, UC 6064 and I searched the interior of the UC vehicle for the presence of any U.S. currency and contraband, with negative results.

16

46.     Prior to the initiation of the operation, MCPD Detectives conducted surveillance of CLARKE's residence and observed CLARKE's vehicle pull into the area of his residence and park next to a black in color Mercedes sedan with a flat front passenger tire that law enforcement later determined was also registered to CLARKE.  Detectives watched as CLARKE entered the driver's seat of the black Mercedes, then walk to and enter his residence.

47.     After a brief amount of time, Detectives observed CLARKE exit his residence carrying a white shopping-type bag that appeared to be empty and enter the driver's seat of the black Mercedes, where he remained for a brief period of time before exiting the vehicle, carrying the aforementioned bag that appeared to now contain unknown items.  CLARKE then entered his vehicle and drove out of the neighborhood in the direction of the shopping center to meet with UC 6064.

48.     A short time later, Detectives conducting surveillance of the meeting location observed CLARKE's vehicle enter the shopping center parking lot and park in a location approximately 150 yards away from UC 6064's vehicle. Detectives watched as CLARKE exited his vehicle, carrying a white bag which appeared to contain a heavy object that resembled at least one firearm and walk toward UC 6064's vehicle. CLARKE entered the front passenger seat, and I monitored the conversation between CLARKE and UC 6064 via body wire, which included the sale of firearms from CLARKE to UC 6064. After a short amount of time and conversation, CLARKE exited UC 6064's vehicle and walked on foot toward his vehicle as UC 6064 departed the parking lot.  Detectives observed CLARKE enter his vehicle and drive away from the shopping center.

49.     I followed UC 6064 back to a pre-designated meeting location and recovered three plastic shopping bags containing one clear gallon-sized "Great Value" brand blue zipper-top Ziploc

17

bag from the passenger compartment of the UC vehicle.  The first Ziploc bag contained one Polymer80 Inc., model PF940C, 9mm caliber, semi-automatic pistol, bearing no apparent serial number, a PMF.  The second contained one Polymer80 Inc., model PF940V2, 9mm caliber, semi-automatic pistol, bearing no apparent serial number, a PMF.  The third contained one Polymer80, Inc., model PF940C, 9mm caliber, semi-automatic pistol, bearing no apparent serial number, a PMF.  Magazines for the firearms were not provided.

50.     During the course of the investigation, I caused a search of the ATF Firearms Licensing System to ascertain if CLARKE possessed a valid FFL to sell and/or manufacture firearms, which was met with negative results.

### ARREST OF CLARKE ON MARCH 7, 2022

51.     Based on the foregoing, on March 4, 2022, I obtained a criminal complaint and arrest warrant for CLARKE, and search and seizure warrants for CLARKE's residence and two of his vehicles, signed by the Honorable Gina L. Simms of the United States District Court for the District of Maryland.

52.     During the beginning of March 2022, UC 6064 communicated via voice and text with CLARKE via cellular telephone number (240) 751-8902 regarding the purchase of narcotics and firearms from CLARKE.  During the course of their communication, CLARKE agreed to sell UC 6064 a fully assembled Glock "Ghost Gun" and two (2) ounces of crack cocaine.  UC 6064 and CLARKE eventually agreed to meet on the morning of March 7, 2022, in a known location in Montgomery County, MD.

53.     Detectives conducting surveillance of the area observed CLARKE's vehicle enter

the parking lot and observed CLARKE exit his vehicle and walk toward a vehicle that UC 6064 told him that UC 6064 would occupy.

54.     As CLARKE was walking in the parking lot, ATF Special Agents moved in to effect his arrest and CLARKE fled the area on foot toward a Wendy's restaurant.  A short foot pursuit ensued, and agents observed CLARKE discard a firearm from his person onto the ground before he was taken into custody. A search of CLARKE**'s** person was conducted and agents recovered approximately two ounces of suspected crack cocaine from CLARKE**'s** right jacket pocket along with **TARGET DEVICE 1**.

55.     Law enforcement then executed the court ordered search and seizure warrant on CLARKE**'s** vehicle and recovered **TARGET DEVICE 2** and **TARGET DEVICE 3**, which were mounted on the windshield of CLARKE**'s** vehicle.  I removed the **TARGET DEVICES**, placed them on the driver's seat of CLARKE**'s** vehicle and set **TARGET DEVICE 2** to airplane mode to prevent the possible destruction of evidence. I could not set **TARGET DEVICE 3** to airplane mode because the screen was either broken or the device was powered off.

56.     The **TARGET DEVICES** were transported to the ATF Hyattsville I Field Office Evidence Vault and **TARGET DEVICE 2** was plugged in to a charging device to maintain its power for the purposes of forensic examination pursuant to a search warrant.

## INDICTMENT OF CLARKE ON MARCH 17, 2022

57.     On March 17, 2022, a federal grand jury for the District of Maryland returned an eight-count indictment against CLARKE for violations 21 U.S.C. § 841(a)(1); possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1); and use and carry a firearm during and in relation to, and possess a firearm in furtherance of, a drug trafficking crime, in

violation of 18 U.S.C. § 924(c). The charged counts are related to the firearm and drug transactions described above that took place on February 10, 2022, February 17, 2022, and February 23, 2022. *See USA v. Clarke*, Crim. No. TDC-22-89.

## CONCLUSION

58.     Based on the information set forth in this affidavit as well as my knowledge that distributors of controlled dangerous substances and/or firearms utilize cellular telephones to discuss things related to narcotics and firearms offenses via voice, text, and e-mail, and to conduct research, keep records, and browse various internet websites related to narcotics and firearms offenses, I submit that there is probable cause to believe that CLARKE has used the **TARGET DEVICES** to violate 21 U.S.C. § 841(a)(1); possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1); use and carry a firearm during and in relation to, and possess a firearm in furtherance of, a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and dealing in firearms without a license, in violation of Title 18 U.S.C. § 922(a)(1)(A). Moreover, I submit that there is probable cause to believe that evidence of the aforementioned offenses will be discovered in the **TARGET DEVICES**.

*John P. Cooney*     Digitally signed by JOHN COONEY
Date: 2022.03.25 15:55:25 -04'00'

John P. Cooney
Special Agent, ATF


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d) this 28th day of March, 2022

_____
Honorable Charles B. Day
United States Magistrate Judge

22-mj-783-CBD

## ATTACHMENT A-1
**Property to Be Searched**

One dark gray in color Samsung, Model SM-G977N cellular telephone, IMEI Number

355741/10/580335/7 SKT, currently secured in the ATF Hyattsville I Field Office Evidence Vault.

22-mj-784-CBD

## <u>ATTACHMENT A-2</u>
**Property to Be Searched**

One silver in color Apple iPhone with yellowish case, Model A1634, FCC ID BCG-E2944A, IC:

579C-E2944A, currently secured in the ATF Hyattsville I Field Office Evidence Vault.

22-mj-785-CBD

**ATTACHMENT A-3**
**Property to Be Searched**

One dark blue in color, Redmi, Model M1906G7G Cellular Telephone, with cracks on  screen and

back of phone, currently secured in the ATF Hyattsville I Field Office Evidence Vault.

22-mj-783-CBD
22-mj-784-CBD
22-mj-785-CBD

**ATTACHMENT B**
**Items to Be Seized**

All records contained in the items described in Attachment A which constitute evidence of violations of, in violation of Title 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled dangerous substances); Title 18 U.S.C. § 922(g)(1) (possession of a firearm by a prohibited person); Title 18 U.S.C. § 924(c) (use and carry a firearm during and in relation to, and possess a firearm in furtherance of, a drug trafficking crime), and; Title 18 U.S.C. § 922(a)(1)(A) (dealing in firearms without a license) (collectively, the "TARGET OFFENSES"), as outlined below:

1.      Any information related to sources of narcotic drugs (including names, addresses, phone numbers, or any other identifying information);

2.      Any information related to sources of firearms and/or privately made firearms (PMFs) (including names, addresses, phone numbers, or any other identifying information);

3.      Communications relating to the TARGET OFFENSES, including lists of sent and received calls;

4.      Internet search history relating to the TARGET OFFENSES;

5.      Stored photographs, videos and images relating to the TARGET OFFENSES;

6.      Digitally stored evidence relating to the types, amounts, and prices of drugs and/or firearms trafficked as well as dates, places, and amounts of specific transactions;

7.      Any records of CLARKE's schedule or travel to identify sources of supply of narcotics and firearms, and CLARKE's customers;

8.      All records of the types, amounts, and prices of firearms purchased or researched as well as dates, places, and amounts of specific transactions;

9.      Bank account numbers, financial records, financial institutions, and other financial data in the name of CLARKE or others that may be related to drug and firearms trafficking and proceeds and payments;

10.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments; and

11.     The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message.

12.     Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

13.     Any and all records related to the location of the user(s) of the devices.

14.     For each of the Devices:

a.   Evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

e.   evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Devices;

f.   evidence of the times the Devices were used;

g.   passwords, encryption keys, and other access devices that may be necessary to access the Devices;

h.   documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

i.   contextual information necessary to understand the evidence described in this attachment.

2

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

       1.      surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

       2.      "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

       3.      "scanning" storage areas to discover and possible recover recently deleted files;

       4.      "scanning" storage areas for deliberately hidden files; or

       5.      performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

       6.      If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.